UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

ROBERT A. WILLIAMS,              )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )          Case No. 2:12CV67 CDP
                                 )
CAROLYN W. COLVIN,[1]            )
Acting Commissioner of Social Security, )
                                 )
          Defendant.             )

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the

Commissioner's final decision denying Robert Williams' application for disability

insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et

seq.*, and his application for supplemental security income under Title XVI, 42

U.S.C. §§ 1381 *et seq.*  Williams claims he is disabled because he suffers from

back problems, depression, and obesity.  After a hearing, the Administrative Law

Judge concluded that Williams was not disabled.  Because I find that the ALJ's

decision was based on substantial evidence on the record as a whole, I affirm.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013.
As such, she is substituted for Michal J. Astrue as the defendant in this lawsuit.  Fed. R. Civ. P.
25(d).

I.      **Procedural History**

Williams filed two applications for disability income benefits and two

applications for supplemental security income.  His first set of applications was

filed in April 2009; his second set was filed in November 2009.  Williams alleged

an onset date of February 17, 2009.[1]  When his applications were denied, he

requested a hearing before an administrative law judge.  Williams then appeared

with counsel at an administrative hearing – held by videoconference – on April 26,

2011.  Williams testified at the hearing.

After the hearing, the ALJ denied Williams' applications, and he appealed to

the Appeals Council.  On July 6, 2012, the Council denied his request for review.

The ALJ's decision thereby became the final decision of the Commissioner.  *Van*

*Vickle v. Astrue*, 539 F.3d 825, 828 (8th Cir. 2008).

Williams now appeals to this court.  He argues that the ALJ's finding of

non-disability is not supported by substantial evidence, specifically because (1) the

ALJ improperly relied on the Medical Vocational Guidelines (the Grids) to

determine Williams' residual functional capacity, though Williams had significant

nonexertional limitations; (2) the ALJ ignored evidence supporting a finding of

disability (including limitations assessed by Williams' surgeon and Williams'

---

[1] Though the ALJ gives an onset date of February 18, 2009, it appears to be February 17.  (*See* Tr., pp. 93, 100.)

subjective complaints of pain); and (3) did not consider the combined effect of Williams' severe and non-severe impairments, including pain and mental symptoms.

## II.  Evidence Before the Administrative Law Judge

### *Medical Records*

According to medical records before the ALJ, Williams was diagnosed with degenerative disc disease and sciatica by orthopedic surgeon Chris Main in 2001. He underwent several physical therapy sessions and two epidural steroid injections that year.  In 2005, he did another course of physical therapy.  On February 20, 2006, Dr. Main noted that Williams had decreased ability to bend forward and backward.  He prescribed Soma, Celexa, and MRIs.  Dr. Main diagnosed Williams with cervical and lumbar disc disease, as well as cervical and lumbar radiculopathy.  The MRIs, completed the following month, showed disc degeneration at C5-6 and C6-7, slight arthrosis[2] and stenosis,[3] minimal posterior bulging at C6-7, and "broad-based herniation" at L4-5.

Two years later, on July 10, 2008, Williams saw Dr. Jeffrey Parker for pain in his low back and left leg.  Williams described how his leg pain had increased in the past two years and was "exacerbated with any activity," including prolonged

---

[2] Degenerative joint changes.  STEDMAN'S MEDICAL DICTIONARY 162 (28th ed. 2006).
[3] Narrowing of the spine that results in pressure on the spinal cord and/or nerve roots.  *Mallon v. U.S. Physical Therapy, Ltd.*, 395 F. Supp. 2d 810, 814 (D. Minn. 2005); *see also* STEDMAN'S MEDICAL DICTIONARY 1832.

bending, lifting, or standing.  He rated his leg and back pain as an 8 out of 10.
Williams reported that he had tried spinal injections, physical therapy, and multiple
medications without lasting success.  Dr. Parker wrote that Williams "really wants
to have something done with this as this really limits his lifestyle."  (Tr., p. 356.)
Over the following months, Williams saw Dr. Parker several more times with
similar complaints and symptoms.  Dr. Parker determined that Williams needed
surgery to fuse his vertebrae at L4 and L5.

On February 17, 2009, Williams was admitted to Boone Hospital Center for
interbody fusion surgery, a left L4-5 laminotomy and foraminotimy,[4] and anterior
versus posterior instrumentation.  Before the surgery, Williams reported that his
pain was now at 9 or 10 out of 10 all the time.  A physical examination revealed
that Williams was in moderate distress, that his back was very tender, and that he
had painful motion, "able to forward flexion only 7 degrees and extend about 20
degrees."  X-rays revealed a retrolisthesis[5] and diffuse disc bulging, with mild
central stenosis, moderate left foraminal stenosis, and a possible central herniation.
The broad-based bulge caused mild narrowing of the central canal, some posterior

---

[4]  Through these procedures, part of a vertebra is removed and the vertebral foramen, also called the spinal canal, is
enlarged to relieve pressure on the root of the spinal nerve.  *See Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d
546, 550 n.3 (D.C. 2001); STEDMAN'S MEDICAL DICTIONARY 759, 1046.
[5]  Retrolisthesis is "backwards slippage of one vertebral body on another."  There is "a possible association between
retrolisthesis and increased back pain and impaired back function."  Michael Shen et al., *Retrolisthesis and Lumbar
Disc Herniation: A Pre-Operative Assessment of Patient Function*, 7 SPINE J. 406 (2007), available at
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2278018/.

displacement, and "mass effect on the descending L5 nerve roots." Dr. Parker

noted that Williams had been "having intractable pain which was not controlled

with nonoperative means" and that he "was felt to have failed nonoperative care."

Williams was discharged on February 21, 2009, after the procedure and four

days of physical therapy. Williams was sent home "in an improved condition,"

required to wear a corset for sitting or standing, and prohibited from bending,

prolonged sitting, or lifting more than five pounds. He was prescribed Percocet

and diagnosed with lumbar spondylosis.

Williams followed up with Dr. Parker in March, April, and May of 2009. At

each visit, Williams reported doing well. A March 4, 2009 work note from Dr.

Parker stated that Williams was "not able to return to work for another 8 weeks due

to recent back surgery." At each appointment, Williams reported that he had no

significant issues and was continuing a walking program. Dr. Parker noted in

April that Williams was "having no problems at all." He wrote that X-rays showed

no change in the alignment of Williams' instrumentation and that his cage was

consolidating "very nicely." At an appointment on May 20, 2009, Dr. Parker

prescribed Oxycodone but noted that Williams "was told he could go to something

less strong the next time he needs a script. I'll plan to have him stay off work as he

–5–

already has filed for disability and I think it is going to take him a while to get over this."

Later that month, on May 28, 2009, Williams saw Dr. Julie Burden to establish a primary care relationship.  She diagnosed Williams with a mood disorder, not otherwise specified, and wrote:

> Depression/dysthymia: Patient states that he had back surgery – was expected to recover in 3 months and be able to return to work; has not been able to return to work and is very distraught over his inability to work; he is struggling with feelings of depression; is sleeping excessively; poor energy level; significant financial stress; still has ongoing back pain and has had to resume oxycodone use with increasing activity; has applied for disability; cannot sit for a prolonged period of time.

(Tr., p. 358.)  Dr. Burdin prescribed Celexa.  At a visit on July 2, 2009, Dr. Burdin noted that Williams reported a better attitude but more fatigue with the Celexa.

On July 22, 2009, Williams followed up with Dr. Parker.  According to treatment notes, Williams reported that he was doing fine except for some left lateral hip pain that came and went but worsened after prolonged standing or walking.  Examination showed that Williams was very tender in his left trochanteric bursal region, a part of the hip.  Dr. Parker prescribed a steroid injection to the hip.  Noting that Williams wanted to go back to work, Dr. Parker wrote a note permitting Williams to return to work but prohibiting him from lifting more than 20 pounds.

– 6 –

Williams saw Dr. Burdin again on September 23, 2009.  He reported that his pain was markedly worse, and that he was irritable and losing sleep because of the pain.  Dr. Burdin switched Williams from Celexa to Effexor.

At a visit the following month, on October 21, 2009, Dr. Parker noted that Williams was having some problems at work because of bending and lifting:

> I told him that he probably would need to consider a job change to something that did not involve heavy bending and lifting. I told him that if he could not do this he may need to consider disability which he has already filed for once but I do feel that he is still having to take narcotics under the guidance of Dr. Burdin on a daily basis for pain control and his job may be causing him more harm than good.

Dr. Parker examined Williams, noting that his back was non-tender and he had "fairly good" range of motion.  Williams reported some tingling in his leg after prolonged sitting.  He planned to continue his daily walking program.

Williams also saw Dr. Burdin in October 2009.  She noted that she had switched Williams back to Oxycodone after Vicodin failed to control his pain.  He was still taking Effexor to treat his mood disorder.  Dr. Burdin wrote that Williams reported problems sleeping, including daily fatigue, snoring, and waking multiple times during the night.  She sent Williams for a sleep study.  Dr. Burdin also noted that he was "not working a lot" but had an appointment with Vocational Rehab coming up.

– 7 –

The sleep study revealed insomnia and sleep hygiene problems, and some evidence of mild apnea but no definitive diagnosis.  At a visit on December 1, 2009, Dr. Burdin wrote that Williams had resumed his work as a bus mechanic but "was not physically able to complete the work so submitted his resignation yesterday."  The pain medication Williams was taking was "reasonably adequate."

In a letter dated December 2, 2009, Dr. Parker wrote:

> I felt that [Williams] was not going to be able to continue working at his job due to the heavy lifting and bending that was required which I felt would be harmful to his back. He has not been able to work since November 11, 2009 due to his chronic back pain.  I feel he would be a good candidate for receiving assistance while is waiting for disability approval or possibility of other types of employment that may be more agreeable with his back condition.

(Tr., p. 482.)

A few weeks later, on December 23, 2009, Williams saw Dr. Burdin again. Williams reported feeling irritable and edgy; his wife, who accompanied him, stated that he had been "hateful."  Dr. Burdin switched Williams from Effexor to Cymbalta.  At a follow-up visit on January 14, 2010, Williams stated that he had not seen much improvement in his mood or level of pain, but he was sleeping a little better and his wife had noticed a decrease in his irritability.

On March 15, 2010, Williams' wife reported to Dr. Burdin that Williams was less irritable but still moody.  Williams stated that he still had ongoing pain

and would take leftover Vicodin when he did any extra activity.  He was experiencing numbness and could not sit "for any length of time." According to Dr. Burdin's notes, Williams had recently slipped on the roof and landed on his hip.

The next month, on April 21, 2010, Williams had another follow-up visit with Dr. Parker, who noted that Williams' back was tender and that he had mild limitation of motion.  Dr. Parker noted that Williams had no acute trauma from the fall.  Dr. Parker wrote that he could not do much operatively to treat Williams.  He was "probably going to have to try to live with some pain" and was "not really employable."

Williams reported in May 2010 to Dr. Burdin that he was doing better on a higher dose of Cymbalta.  However, six months later, at a visit in November 2010, he stated that his wife disagreed.  According to Dr. Burdin's treatment notes, Williams said his mood was relatively stable, but he still had persistent irritability. He reported that the intensity of his pain had worsened.  Williams also reported that his left leg would go numb but was not as bad if he stayed standing.  Dr. Burdin noted that Williams stood for most of the visit, leaning forward slightly. Williams received an epidural steroid injection in December 2010.

### *Medical Source Statement*

At a visit to Dr. Parker on March 16, 2011, Williams reported that he was

"doing about the same."  Dr. Parker has stated that his clinical notes from that visit

constitute a medical source statement.  (*See* Tr., p. 318.)  He wrote:

> [Williams] states that he still has a lot of back pain but nothing severe
> as long as he is not doing any lifting.  If he tries to do any type of
> vigorous work his pain increases and he really cannot work outside
> the home because of his severe discomfort and the need to lie down
> frequently.  He also states that when he overdoes it his left leg
> continues to both him. . . . I think that he is disabled from back pain
> and left leg pain which is probably not going to be amendable to any
> further surgical intervention.  He still has to take pain medications on
> a frequent basis and he cannot do any prolonged standing for more
> than about an hour without need for rest and he cannot do any
> prolonged sitting.  He also cannot really lift more than 5 pounds
> occasionally.

(Tr., p. 486.)

Williams' last medical record before the hearing was a visit to Dr. Burdin on

March 24, 2011.  He reported some irritability but stated that his spirits were

better.  Williams told Dr. Burdin that Dr. Parker had told him "he was as good as

he was going to get."

### *Psychiatric Review Techniques*

On August 3, 2009, Michael Stacy, PhD, completed a psychiatric review

technique, assessing Williams' records for evidence of a mood disorder, NOS.  He

found that Williams had no limitations in his activities of daily living or in

– 10 –

maintaining concentration, persistence, or pace, as well as no episodes of decompensation.  He found that Williams had mild difficulties in maintaining social functioning.  Stacy noted that Williams had only sought treatment a few months prior, reporting feelings of depression, excessive sleep, poor energy, significant financial stressors, and continuing back pain.  He was taking an anti-depressant but had never been hospitalized or seen a psychiatrist.  Stacy also noted that Williams lived with his wife in a house, could independently do his personal care tasks, performed some household chores, enjoyed working and spending time with others, and reported no difficulty with instructions or authority figures.  Stacy found Williams to be generally credible and his condition to be non-severe.

Seven months later, on March 5, 2010, Mark Altomari, PhD, completed a second PRT.  Again assessing Williams for mood disorder, NOS, Altomari found the same limitations.  He noted that Williams had switched anti-depressants and his wife had noticed some decrease in irritability.  Altomari also found Williams to be generally credible and his functional limitations to be non-severe.

### *Physical RFC Assessments*

On August 5, 2009, Erica Robertson, a consultant for Disability Determination Services, completed a physical residual functional capacity assessment.  Robertson found that Williams had the following exertional

limitations: he could occasionally lift up to 20 pounds; frequently lift up to 10 pounds; stand, walk, or sit for up to six hours in an eight-hour work day; and engage in unlimited pushing and pulling.  Williams could occasionally stoop, kneel, crouch, crawl, and climb ladders, ropes, or scaffolds, and frequently balance and climb ramps and stairs.  He had no visual, manipulative, or communicative limitations.  Robertson found that Williams should avoid concentrated exposure to extreme cold, vibration, and hazards.  She noted that his allegations and reported limits were generally credible and appeared to be "consistent with the medical and laboratory findings."  Although Williams could not do heavy work, he appeared "capable of performing light exertion work on a consistent basis."

On March 5, 2010, Sarah Jones, another DDS consultant, completed a second RFC assessment.  Jones found the same exertional limitations.  Williams could occasionally climb ramps or stairs, stoop, kneel, crouch, or crawl; frequently balance; and never climb ladders, ropes, or scaffolds.  He had no visual, manipulative, or communicative limitations.  Jones found that Williams should avoid concentrated exposure to vibration and hazards.  Jones noted that although Williams alleged obesity, that condition would not cause any more limitations than those caused by his back impairment.   At the time Jones made her assessment, there was no source statement in Williams' file.

– 12 –

### *Function Reports*

Williams completed a function report on December 26, 2009.  He wrote that before his surgery, he was able to work on his farm, ride and care for his horses, and work as a bus mechanic.  Since the surgery, he could not do those things.  He also could not bend over to pick up laundry baskets, put laundry into the washer, bale hay, or stack hay bales.

He described what he did each day, including making coffee, feeding two chickens and two dogs, napping, watching television, and eating supper with his wife.  He was still able to attend to his personal care, prepare simple meals, and do some cleaning.  He was able to handle money, follow instructions, get along with others, and he talked on the phone to two or three other people every day.

Williams reported that he had problems lifting, squatting, bending, reaching, sitting, kneeling, and climbing stairs.  He wrote, "I can no longer bend over or squat the amount of times it requires to work on equipment getting up and down off and on a rolling creeper under the buses."  Back pain kept him from sleeping.

In an earlier function report, dated May 18, 2009, Williams reported many of the same limitations.  At that time, Williams wrote that he could only lift ten pounds and could not handle stress or changes in routine very well.

– 13 –

Williams' wife Doris also completed two function reports.  She reported that Williams dusted, swept floors, did laundry, loaded and unloaded the dishwasher, and watered flowers.  Williams often had to use a grabber, and he could not use the lawnmower because of pain.  He no longer cooked a variety of foods or cut wood. Doris Williams wrote that her husband handled changes in routine "pretty well." He had "not been one to lay around, he has always been active & worked hard." Being disabled was "a lot different for him."  She had noticed that Williams was afraid he could not support his family because "at the moment he cannot do anything.  He can't do what he used to be able to do."

### *Testimony at the April 26, 2011 Hearing*

Williams testified at the hearing before the ALJ.  He stated that he was 44 years old and had finished high school.  After his back surgery on February 17, 2009, he had returned to work as a bus mechanic for several months.  He tried to work 20 hours per week.  Williams testified that by the third or fourth time he had to stand up from undercarriage roller or the concrete floor, "that really started to bother [him] pretty bad."  He would try to lay out all his tools on the floor to avoid having to stand up.

Williams stated that when he overexerted himself by doing "a little extra work," he would have to miss work the next day.  This happened at least weekly.

Williams testified that he stopped working because the pain from "getting up and down off of the creeper" and bending over became unbearable.

Williams stood during the hearing, stating that standing or lying flat were the most comfortable positions for him.  Sitting for more than three or four minutes caused him pain.  At home, he would stand most of the time, resting occasionally, and when it got too bad, he would go lie down and take a nap.

Williams testified that he had been diagnosed with degenerative disc disease. He was taking five milligrams of Oxycodone every two hours for pain relief.  The Oxycodone helped with his pain but did not relieve it completely.  He had tried steroid injections but they did not help at all.  Williams stated that if he stood still too long or sat down for more than five minutes, his left leg would go to sleep.  He could walk without limitation, but could not stand still.  He could "lean up against a wall just to get a little relief" if he had been standing for a long time.

Williams testified that he could lift 20 pounds, but not continuously and not bending over to pick things up.  He stated that he had a hand-held grabber he used to pick things up off the floor.  Williams testified that he did some laundry, some dishes, and some cooking, but since he could not stand still very long, he would start and then "have to go move, walk around."

– 15 –

Williams also stated that he had been diagnosed with depression.  He took 60 milligrams of Cymbalta twice per day, which he stated was helpful.  When asked about his symptoms, he testified that "[i]f you don't feel good . . . , a lot of days, you just don't feel like getting out of bed, and it's hard to do."  He stated that he did not experience anger, aggression, or problems socializing.

Williams testified that he could no longer hunt, fish, or pick up his grandson like he used to.  He stated that his wife told him he did not sleep very well, and that he would get up three or four times per night.

## III.   Standard for Determining Disability Under the Social Security Act

Social security regulations define disability as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 416(i)(1); 42 U.S.C. § 1382c(a)(3)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a).

Determining whether a claimant is disabled requires the Commissioner to evaluate the claim based on a five-step procedure.  20 C.F.R. § 404.1520(a), 416.920(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).

First, the Commissioner must decide whether the claimant is engaging in substantial gainful activity.  If so, he is not disabled.

Second, the Commissioner determines if the claimant has a severe impairment which significantly limits the claimant's physical or mental ability to do basic work activities.  If the impairment is not severe, the claimant is not disabled.

Third, if the claimant has a severe impairment, the Commissioner evaluates whether it meets or exceeds a listed impairment found in 20 C.F.R. Part 404, Subpart P, Appendix 1.  If the impairment satisfies a listing in Appendix 1, the Commissioner will find the claimant disabled.

Fourth, if the claimant has a severe impairment and the Commissioner cannot make a decision based on the claimant's current work activity or on medical facts alone, the Commissioner determines whether the claimant can perform past relevant work.  If the claimant can perform past relevant work, he is not disabled.

Fifth, if the claimant cannot perform past relevant work, the Commissioner must evaluate whether the claimant can perform other work in the national economy.  If not, he is declared disabled.  20 C.F.R. § 404.1520; § 416.920.

*Evaluation of Mental Impairments*

– 17 –

The Commissioner has supplemented the familiar five-step sequential process for evaluating a claimant's eligibility for benefits with additional regulations dealing specifically with mental impairments.  20 C.F.R. § 404.1520a. As relevant here, the procedure requires an ALJ to determine the degree of functional loss resulting from a mental impairment.  The ALJ considers loss of function to four capacities deemed essential to work.  20 C.F.R. § 404.1520a(c)(2). These capacities are: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings.  20 C.F.R. § 404.1520a(c)(3).  After considering these areas of function, the ALJ rates limitations in the first three areas as either: none; mild; moderate; marked; or extreme.  The degree of limitation in regard to episodes of decompensation is determined by application of a four-point scale: none; one or two; three; or four or more.  *See* 20 C.F.R. § 404.1520a(c)(4).

## IV.   The ALJ's Decision

The ALJ first determined that Williams met the insured status requirements throughout the period of alleged disability and that he had not engaged in any substantial gainful activity since the onset date.

At the second step, the ALJ determined that Williams had severe impairments of degenerative disc disease status post L4-5 fusion and obesity.

Based on his height and fluctuating weight, Williams was sometimes at Level I obesity, under Social Security regulations, and sometimes non-obese. The ALJ noted that the "combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." *See* SSR 02-01. The ALJ also found that Williams had medically determinable impairments of depression and marijuana abuse, but that those impairments were non-severe. In support of this finding, the ALJ pointed out that Williams had not been referred to counseling or therapy and that Dr. Burdin, Williams' primary care physician, believed his depression was circumstantial.

Considering the four functional areas as required in cases where a claimant alleges a mental impairment, the ALJ found that Williams had no limitation in the areas of activities of daily living or concentration, persistence, or pace, and that Williams had no episodes of decompensation. In support of these findings, the ALJ noted that Williams could independently do his personal care tasks, prepare simple meals, complete some household chores, drive, walk, follow instructions, and get along with authority figures. The ALJ found that Williams had mild limitations in the area of social functioning because his irritability and anger had increased after his surgery.

– 19 –

Proceeding to the third step, the ALJ determined that none of Williams'
impairments met or medically equaled a listing.

At step four, the ALJ found that Williams had the RFC to perform light
work, except with only occasional climbing, stooping, kneeling, crouching, and
crawling; no ladders, ropes, or scaffolds; no concentrated exposure to hazards due
to the side effects of Williams' medications; and no concentrated exposure to
vibration to avoid exacerbation of his symptoms.  The ALJ found that Williams'
medically determinable impairments could reasonably be expected to produce the
symptoms he alleged, but that his "statements concerning the intensity, persistence
and limiting effects of these symptoms are not credible to the extent they are
inconsistent with" the assessed RFC.

In support of his finding, the ALJ noted that Williams' credibility was
undermined by his activities, including falling from a roof in early 2010, working
part-time with a 20-pound weight restriction until the end of November 2010, and
walking six or seven miles for exercise daily.  Medical evidence, such as normal
neurological exams, negative straight leg-raising tests, and consistent X-rays
showing successful instrumentation, was also inconsistent with allegations of
disabling pain.

In determining Williams' RFC, the ALJ gave great weight to the opinion of state psychological consultant Dr. Altomari, finding it well-supported by the medical evidence and consistent with Dr. Burdin's treatment records, wherein she prescribed medication but no counseling.  The ALJ also gave great weight to Dr. Parker's opinion that Williams could not return to his heavy and medium-exertion job.  However, the ALJ only gave "some weight" to the function reports completed by Williams' spouse.  He also gave some weight to Dr. Parker's March 16, 2011 opinion that Williams was disabled; could not lift more than five pounds occasionally; could not do prolonged sitting; and could not stand for more than an hour.  The ALJ wrote:

> [Other] that then limitation in range of motion, Dr. Parker failed to address specific exertional or nonexertional limitations supported by reference to specific findings upon physical examination or laboratory testing or x-rays to support the imposition of such restrictions.

(Tr., p. 18.)  The ALJ noted that Dr. Parker had regularly reported that the instrumentation had been successful and was filling in with bone nicely; that Williams' restricted range of motion was only mild; that there were no contemporaneous progress notes from Dr. Parker to corroborate his assessment, and that the ultimate issue of disability was reserved for the Commissioner.

After determining Williams' RFC, the ALJ found that Williams could not do any of his past relevant work.  However, using the Grids, the ALJ found that

– 21 –

Williams could do other unskilled, light work. The ALJ wrote that Williams'

additional limitations, including stooping, bending, crouching, keeling, crawling,

balancing, and climbing ropes, ladders, and scaffolds had "little or no effect on the

occupational base of unskilled light work."

## V.     **Standard of Review**

This court's role on review is to determine whether the Commissioner's

decision is supported by substantial evidence on the record as a whole. *Rucker v.*

*Apfel*, 141 F.3d 1256, 1259 (8th Cir. 1998). "Substantial evidence" is less than a

preponderance but enough for a reasonable mind to find adequate support for the

ALJ's conclusion. *Id.* When substantial evidence exists to support the

Commissioner's decision, a court may not reverse simply because evidence also

supports a contrary conclusion, *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir.

2005), or because the court would have weighed the evidence differently.

*Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

To determine whether substantial evidence supports the decision, the court

must review the administrative record as a whole and consider:

(1) the credibility findings made by the ALJ;

(2) the education, background, work history, and age of the claimant;

(3) the medical evidence from treating and consulting physicians;

(4) the plaintiff's subjective complaints relating to exertional and

nonexertional impairments;

(5) any corroboration by third parties of the plaintiff's impairments; and

(6) the testimony of vocational experts, when required, which is based upon

a proper hypothetical question.

*Stewart v. Sec'y of Health & Human Servs.*, 957 F.2d 581, 585–86 (8th Cir. 1992).

## VI.   <u>Discussion</u>

Williams argues that the ALJ's opinion is not supported by substantial

evidence for several reasons: (1) the ALJ improperly relied on the Medical

Vocational Guidelines (the Grids) to determine Williams' residual functional

capacity, though Williams had significant nonexertional limitations; (2) the ALJ

ignored evidence (including Williams' subjective complaints of pain and

limitations assessed by Williams' surgeon) supporting a finding of disability; and

(3) the ALJ did not consider the combined effect of Williams' severe and non-

severe impairments.  I will address each of Williams' arguments.

## A.   <u>*The ALJ Properly Relied on the Grids*</u>

A nonexertional impairment is one that "does not directly affect the ability

to sit, stand, walk, lift, carry, push, or pull."  Social Security Ruling 83-10.  Among

other things, nonexertional impairments include pain, obesity, and mental

limitations.  *See, e.g.*, *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012) (pain and mental impairments); *Thompson v. Bowen*, 850 F.2d 346, 350 (8th Cir. 1988) (obesity); *see also* SSR 83–10, at *7 (e.g., inability to withstand environmental hazards).  When a claimant suffers from exertional and nonexertional impairments, and the exertional impairments alone do not warrant a finding of disability, the ALJ must consider the extent to which the nonexertional impairments further diminish the claimant's work capacity.  *Lucy v. Chater*, 113 F.3d 905, 908 (8th Cir. 1997) (citing *Thompson v. Bowen*, 850 F.2d 346, 349 (8th Cir. 1988)).

In this case, the ALJ used the Medical Vocational Guidelines (the Grids) to determine that Williams was not disabled.  20 C.F.R. § 404, Subpt. P, App. 2 (§ 202.21).  The Grids are "fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment."  *Foreman v. Callahan*, 122 F.3d 24, 25 (8th Cir. 1997).  The "rules themselves recognize that they contemplate primarily the range of jobs available to those whose impairments are principally exertional."  *Id.* at 26.

For claimants with nonexertional impairments, the Grids are generally not controlling and cannot be used to direct a conclusion of disabled or not disabled without regard to other evidence such as vocational testimony.  *McCoy v.*

*Schweiker*, 683 F.2d 1138, 1148 (8th Cir. 1982) (abrogated on other grounds).  But
the Eighth Circuit has recognized an exception to this general rule.  The use of the
Grids alone is permissible in cases where the ALJ finds that the claimant's
nonexertional impairments do not significantly diminish the claimant's RFC to
perform the full range of activities listed in the guidelines.  *Brock v. Astrue*, 674
F.3d 1062, 1064 (8th Cir. 2012) (quoting *Reed v. Sullivan*, 988 F.2d 812, 816 (8th
Cir. 1993)).  In such a case, the record must support the ALJ's finding.  *Brock*, 674
F.3d at 1065 (citing *Wheeler v. Sullivan*, 888 F.2d 1233, 1238-89 (8th Cir. 1989)).

### *Postural and Environmental Limitations*

Here, the ALJ made a factual determination that Williams had an RFC to
perform light work, except with only occasional climbing, stooping, kneeling,
crouching, and crawling; no ladders, ropes, or scaffolds; no concentrated exposure
to hazards; and no concentrated exposure to vibration.  The ALJ then used the
Grids, 20 C.F.R. § 404, Suppt. P, App. 2 (§ 202.21), which led him to the
conclusion that Williams was not disabled.  Although the ALJ had found that
Williams could not perform "a full range of light work," as the Grids anticipate,
but instead had certain additional limitations, the ALJ properly noted that those
limitations had "little or no effect on the occupational base of unskilled light
work."  *See* 20 C.F.R. § 404.1567 (definition of light work does not reference

– 25 –

climbing, stooping, kneeling, crouching, or crawling); SSR 83-14 ("[T]o perform substantially all of the exertional requirements of most sedentary and light jobs, a person would not need to crouch and would need to stoop only occasionally."); SSR 85-15 (person who cannot work near dangerous machinery is "someone whose environmental; restriction does not have a significant effect on work that exists at all exertional levels"; a need to "avoid excessive amounts of noise, dust, etc." would have only a "minimal" impact on "the broad world of work"; "If a person can stoop occasionally . . . in order to lift objects, the sedentary and light occupational base is virtually intact."). As such, the postural and environmental impairments found by the ALJ did not significantly diminish Williams' RFC. *See Brock*, 674 F.3d at 1064.

Williams argues that the ALJ's use of the Grids did not account for his other nonexertional impairments, including depression and pain. But the ALJ did consider these impairments and properly found that they did not significantly diminish Williams' RFC.

## *Depression*

First, the ALJ determined that Williams' depression did not constitute a severe impairment. This determination is supported by the record, which indicates that Williams' symptoms were controlled with medication; that Williams had

never been referred to a mental health provider for therapy; and that his primary

care physician believed that the depression was circumstantial.  *See Davidson v.*

*Astrue*, 578 F.3d 838, 846 (8th Cir. 2009) (though his symptoms sometimes

worsened, claimant's depression was generally controlled by medication and was

therefore not disabling); *Dunahoo v. Apfel*, 241 F.3d 1033, 1039–40 (8th Cir.

2001) (fact that claimant's depression was situational and claimant did not attend

counseling supported ALJ's finding that depression "did not result in significant

functional limitations"); *Hilkemeyer v. Barnhart*, 380 F.3d 441, 447 (8th Cir. 2004)

("The ALJ's decision not to incorporate [claimant's mild impairment] in the RFC .

. . was not error because the record does not suggest there were any limitations

caused by this nonsevere impairment.").

## *Pain*

Second, the ALJ found that Williams' statements about the intensity,

persistence, and limiting effects of his pain were not credible.[6]  The ALJ

acknowledged that Williams could not return to heavy or medium work, but that

his RFC to do light work took into account his credible allegations of limitations

caused by pain.  *See Brock*, 674 F.3d at 1065 (where the extent of the

nonexertional limitation depends on the credibility of subjective testimony about

---

[6]  The ALJ's finding of non-credibility was also proper and is discussed in more detail below.

pain, the ALJ may rely solely on the Guidelines under the exception because pain is closely related to the claimant's exertional ability).  This determination is also supported by the record, which shows that during the period of alleged disability, Williams worked part-time with a 20-pound weight restriction; walked six or seven miles daily; fell off his roof; underwent x-rays showing that his fusion surgery had been successful; and had normal neurological exams and negative straight leg-raising tests.

In short, although it might have been preferable to have a vocational expert in this case, it was permissible for the ALJ to use the Grids to meet his burden of showing that Williams could perform work at step five of the sequential evaluation.

## B.   *The ALJ Properly Considered Evidence from Williams' Treating Surgeon*

A treating physician's opinions must be given controlling weight if they are well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence.  *Renstrom v. Astrue*, 680 F.3d 1057, 1064 (8th Cir. 2012); *see also* 20 C.F.R. § 416.927(c).  But because the record must be evaluated as a whole, the Eighth Circuit has cautioned that the opinions of a treating doctor do "not automatically control."  *Renstrom*, 680 F.3d at 1064.  After reviewing the record as a whole, an ALJ may discount or

disregard a treating physician's opinion if other medical assessments are supported by better or more thorough medical evidence, or where a treating physician gives inconsistent opinions that undermine the credibility of the opinions.  *E.g., Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).

In this case, Williams' back surgeon, Dr. Parker, submitted a medical source statement.  After noting that Williams continued to report a lot of pain, Dr. Parker wrote, "I think that he is disabled from back pain and left leg pain which is probably not going to be amendable to any further surgical intervention.  He still has to take pain medications on a frequent basis and he cannot do any prolonged standing for more than about an hour without need for rest and he cannot do any prolonged sitting.  He also cannot really lift more than 5 pounds occasionally."

The ALJ only gave "some weight" to this statement, noting that besides a limitation in Williams' range of motion, Dr. Parker did not reference any objective findings that supported his conclusion that Williams was disabled.  To the contrary, Dr. Parker had regularly reported that Williams' back instrumentation was filling in with bone nicely and that Williams' restricted range of motion was only mild.  *See Renstrom*, 680 F.3d at 1064 (ALJ may discount opinion of treating physician who "renders inconsistent opinions that undermine the credibility of such opinions").  Further, there were no contemporaneous progress notes from Dr.

– 29 –

Parker to corroborate his assessment on March 16, 2011.  In fact, Williams had not

seen Dr. Parker since the previous April, some eleven months earlier, before that

visit.  In addition, Dr. Parker's statement is based almost entirely on Williams'

reports of pain, which, as discussed below, the ALJ properly found not credible.

*See Thiele v. Astrue*, 856 F.Supp.2d 1034, 1048 (D. Minn. 2012) (where treating

doctor's opinion "was explicitly based on Plaintiff's subjective report of her

abilities," it was "of limited evidentiary value") (citing *Holmstrom v. Massanari*,

270 F.3d 715, 721 (8th Cir. 2001).

## C.     *ALJ Properly Considered Williams' Subjective Complaints*

Williams also contends that the ALJ ignored his subjective complaints of

pain.  Evidence of pain is necessarily subjective in nature. Therefore, an ALJ must

look to more than just objective medical evidence, or the lack thereof, in

determining whether and to what extent a claimant's symptoms affect the ability to

perform work-related activities.  *Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir.

1993); *Delrosa v. Sullivan*, 922 F.2d 480, 485 (8th Cir. 1991).

Under the framework set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1321–

22 (8th Cir .1984), an ALJ must fully consider all evidence relating to the

subjective complaints, including the claimant's work record, as well as

observations of the claimant by others (including treating and examining doctors)

– 30 –

as to such matters as daily activities; the intensity, duration, and frequency of the symptoms and conditions causing and aggravating the symptoms; and functional limitations. *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008). An ALJ is permitted to discount the claimant's complaints if they are "inconsistent with the evidence as a whole." *Id.* (quoting *Casey v. Astrue*, 503 F.3d 687, 695 (8th Cir. 2007)). When discounting a claimant's complaints, the ALJ is required to "detail the reasons for discrediting the testimony and set forth the inconsistencies found." *Ford*, 518 F.3d at 982 (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)).

Here, the ALJ properly considered Williams' complaints of pain and made credibility findings supported by evidence in the record. The ALJ determined that Williams' testimony was not credible in part because there was a lack of medical evidence supporting his claims: he had only mild limitation of motion in his back; his neurological exams were normal; and he had negative straight-leg raising tests. Although an ALJ may not discount testimony solely due to a lack of medical evidence, it is one factor that may properly be considered. *Halpin v. Shalala*, 999 F.2d 342, 346 (8th Cir.1993).

In addition, the ALJ considered Williams' work record as a bus mechanic and his daily activities, which showed that he worked part-time with a 20-pound

weight restriction during part of the period of alleged disability; walked six or seven miles daily; and fell off his roof.  He also independently did his personal care tasks and did some household chores. The ALJ also noted that Williams had reported to Dr. Parker in March 2011 that he had no severe pain if he was not lifting.

I conclude that the ALJ properly discredited Williams' allegations of disabling pain and limitations, and there are good reasons for doing so.  Therefore, I defer to his finding of non-credibility.  *See Perkins*, 648 F.3d at 900 ("If the ALJ discredits a claimant's credibility and gives a good reason for doing so, we will defer to its judgment even if every factor is not discussed in depth.").

## D.    *ALJ Properly Considered Impairments in Combination*

Finally, Williams argues that the ALJ did not address the relationship between his impairments.  However, the Eighth Circuit has held that an ALJ properly considers the combined effects of a claimant's impairments when the ALJ separately discusses each impairment and still concludes that the claimant does not have a combination of impairments that render him disabled.  *Martise v. Astrue*, 641 F.3d 909, 924 (8th Cir. 2011).  As discussed above, the ALJ adequately discussed each of Williams' impairments before determining his residual

functional capacity. He has thus satisfied the Eighth Circuit standard for considering the combined effects of a claimant's impairments.

## VII.  Conclusion

Based on the foregoing, I conclude that there is substantial evidence on the record to support the Commissioner's decision to deny benefits.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed.

A separate judgment in accord with this Memorandum and Order is entered this date.


_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE


Dated this 16th day of September, 2013.